UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.    19 CV 00195 |
| Plaintiff, | ) | |
| | ) | Judge |
| vs. | ) | |
| | ) | |
| FUNDS IN THE AMOUNT OF $224,100 | ) | |
| IN UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendant, *In Rem*. | ) | |

**VERIFIED COMPLAINT FOR FORFEITURE, *IN REM***

COMES NOW, before this honorable Court, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to the provisions of Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp.") G(2), respectfully, to bring this Verified Complaint for Forfeiture *In Rem*.

Plaintiff hereby alleges as follows:

**Nature of the Action**

1. This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2. This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3. This civil action *in rem* is brought to forfeit property pursuant to the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A), and 981(a)(1)(C), because it: (1) was involved in, (2) was used or intended to be used to facilitate, (3) was furnished or intended to be furnished in

exchange for, or (4) is proceeds (or property) traceable to, a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(A).

4.  Based upon the facts and circumstances herein set forth, Plaintiff prays: (1) that process issue for an arrest warrant *in rem* for the subject property; (2) that notice be given to all parties to appear and show cause why forfeiture should not be decreed; (3) that this Court enter a judgment of forfeiture to the United States; and (4) that this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

5.  This complaint is verified by the attached Verification of Drug Enforcement Administration ("DEA") Task Force Officer Arnold Martinez ("TFO Martinez"), which is fully incorporated herein.

## The Defendant *In Rem*

6.  The Defendant *in rem* consists of the following property:

- $224,100 (two-hundred twenty four thousand and one hundred dollars) in United States currency.

(Hereinafter, the "subject property").

7.  The subject property was seized on July 30, 2018, by the DEA Group 24 Task Force ("Group 24") operating out of Amtrak® Union Station in Chicago, Illinois ("Union Station"), to which TFO Martinez is assigned.

8.  The subject property is currently in the custody of the United States Marshals Service.

## Jurisdictional Statement

9.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this action is commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture.

10. This Court has *in rem* jurisdiction over the subject property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(a) (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

**Basis for Forfeiture**

12. The subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

13. The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

14. The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from "proceeds traceable" to "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering

enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

### Summary of Facts

15. On July 30, 2018, members of DEA Group 24 conducted a consensual interview and search at Union Station, which led to the discovery and seizure of the subject property from Anthony and Debbie Cheng ("Mr. and Mrs. Cheng"), passengers traveling together via Amtrak® on one-way first class tickets from Pittsburg, Pennsylvania to Denver, Colorado.

16. A police canine certified by the State of Illinois, the North American Police Work Dog Association ("NAPWDA") and Vapor Wake K9 demonstrated as a positive alert on the subject property, indicating the presence of one of five odors he is trained to detect.

17. Based upon the experience of DEA Group 24 officers, including TFO Martinez, and the totality of the circumstances further described below, the subject property was seized for forfeiture.

### Facts

I.   Union Station Interdiction and Discovery of the Subject Property

    A.  Overview of DEA Group 24 at Union Station

18.   This Complaint describes an investigation conducted by members of DEA Group 24 at Union Station, to which TFO Martinez is a member.

19.   The primary responsibility of Group 24 is to investigate crimes involving the use of public train stations, commercial airlines, and shipping companies to transport illegal drugs and drug proceeds.

20.   Based upon the experience of Group 24 investigators and in similar investigations across the United States, it is common knowledge that cities in the mid-west and east coast are demand

locations for illicit drugs.

21.   States such as Arizona, California, and Colorado are considered source locations due to their close proximity to the border of Mexico and established drug transportation routes.

22.   Person(s) involved in the illegal drug trade, often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing public train stations, commercial airlines, and shipping companies.

23.   In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious travel itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

24.   Factors that constitute suspicious travel itineraries include ticket purchase at the counter immediately prior to departure or short notice reservations for one-way travel, sometimes paid in cash.

25.   In addition, Group 24 investigators know that it is common for couriers to utilize a third-party credit card to purchase tickets and to provide inaccurate or not in-service telephone numbers to airline and other transit companies.

26.   Couriers often travel with minimal luggage and routinely attempt to board at the last possible moment.

27.   Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement and minimize their exposure to commercial airlines and passenger railroad services.

   B.   Travel Itinerary and Suspicious Behavior of Amtrak® Passengers Mr. and Mrs.
   Cheng

28. On July 30, 2018, at approximately 10:00 a.m., law enforcement officers assigned to Group 24 were alerted to the suspicious travel itinerary of Mr. and Mrs. Cheng.

29. Mr. and Mrs. Cheng were initially traveling first class from Pittsburg, Pennsylvania to Kingman, Arizona, on Amtrak® train number 29/3; then via Greyhound® bus number 8003 on to Las Vegas, Nevada.

30. Mr. and Mrs. Cheng's tickets were purchased with a third-party credit card in the amount of $1,182.

31. Based upon the training and experience of Group 24 investigators, it is common for couriers to utilize third-party credit cards to purchase tickets.

32. TFO Martinez noticed that Mr. and Mrs. Cheng rebooked their tickets while in Chicago and were now set to travel to Denver, Colorado on train number 5.

33. Mr. and Mrs. Cheng paid an additional $15 for the change in travel.

34. Group 24 investigators know that those who transport illegal drugs, or the proceeds of illegal drug trafficking, often keep them on their person or accompanying bags or suitcases and routinely change their travel plans at the last possible moment.

35. Group 24 investigators sought to conduct a consensual interview of Mr. and Mrs. Cheng prior to them boarding Amtrak® train number 5.

36. In an attempt to assist in locating Mr. Cheng, agents obtained a photo of Mr. Cheng through open internet resources.

37. At approximately 1:05 p.m., Amtrak® Canine Officer Robert Crowley ("Officer Crowley") and his canine partner "Gander," along with TFO Martinez, Special Agent Kevin Frankel, and Task Force Officer Eddy Sobkowiak ("TFO Sobkowiak"), arrived at Chicago Union Station's Metropolitan Lounge.

38.   Gander is currently five years old and Officer Crowley is Gander's second handler.

39.   Gander is certified by the State of Illinois (most recently on August 30, 2018), the NAPWDA (most recently on April 4, 2018), and Vapor Wake K9 (most recently on April 6, 2018).

40.   Gander was last certified prior to this investigation by the State of Illinois on November 29, 2017.

41.   Gander is trained and certified to detect five odors: (1) marijuana, (2) cocaine, (3) heroin, (4) ecstasy, and (5) methamphetamine.

42.   If at any time during a search Gander smells one of the five odors he is trained to detect, Gander will alert with an active/passive alert at the area where he smells the odor.

43.   At this time, Group 24 members were dressed in casual civilian clothing with no weapons, radios, or other police paraphernalia visible.

44.   Officer Crowley and Gander entered the Metropolitan Lounge with members of Group 24.

45.   Agents observed Mr. Cheng standing by the service desk.

46.   When Officer Crowley walked with Gander toward the service desk, Mr. Cheng looked at them and immediately walked away from the desk and into the baggage room.

47.   When Officer Crowley and Gander followed Mr. Cheng into the baggage room, Mr. Cheng turned around, walked out of the baggage room, and headed toward a table in the dining area.

48.   When Officer Crowley approached the dining area, Mr. Cheng walked toward the doors to leave the Metropolitan Lounge.

49.   Based upon the training and experience of Group 24 investigators, it is common for

couriers to attempt to evade law enforcement by leaving the area and attempting to board the train from a different location.

C. Initial Interview with Mr. and Mrs. Cheng

50. At approximately 1:07 p.m., TFO Martinez approached Mr. Cheng prior to him leaving the Metropolitan Lounge and identified himself as a law enforcement officer by displaying his credentials and badge

51. TFO Martinez advised Mr. Cheng that he was not under arrest, was not in any kind of trouble, and that he was requesting a consensual interview.

52. Mr. Cheng stated that he understood and agreed to speak with agents.

53. When TFO Martinez asked Mr. Cheng if he was traveling by himself or with someone else, Mr. Cheng stated that his wife was waiting for him outside the lounge.

54. TFO Martinez informed Mr. Cheng that he would like to speak to both he and his wife.

55. Mr. Cheng answered, "[o]k, is something wrong," to which TFO Martinez informed that agents were simply conducting interviews with ticketed passengers.

56. Mr. Cheng walked toward the boarding area, pointed to a woman sitting by the fountain, and stated that was his wife.

57. TFO Martinez identified himself to Mrs. Cheng by displaying his credentials and badge.

58. TFO Martinez advised Mr. and Mrs. Cheng that they were not under arrest, were not in any kind of trouble, and that it was a consensual interview.

59. Mr. and Mrs. Cheng agreed together to speak with agents.

60. TFO Martinez requested to see their boarding pass and identification, and Mr. Cheng provided both boarding passes.

61. TFO Martinez examined their boarding passes and asked whether they were taking train

3 to Kingman, Arizona.

62. Mrs. Cheng said that the rooms were too small and Mr. Cheng added that the trip to Kingsman was too long.

63. When asked about their final destination, Mr. Cheng informed "Denver."

64. TFO Martinez verified both names on the boarding passes and handed them back to Mr. Cheng.

65. Mr. Cheng then handed TFO Martinez a valid Nevada driver's license bearing the name Anthony Cheng.

66. Mr. Cheng appeared to be very anxious, and his hands were visibly shaking.

67. TFO Martinez noted the information on the Nevada driver's license and handed the license back to Mr. Cheng.

68. Mr. Cheng then handed TFO Martinez a valid New York driver's license, bearing the name Debbie Cheng, which TFO Martinez also noted and handed the license back to Mr. Cheng.

69. When asked where they live, Mrs. Cheng informed the address on her license was an old address and they now live in Las Vegas, Nevada.

70. When asked about their final destination once more, both replied "Las Vegas."

71. When asked why their previous ticket to Las Vegas was changed to Denver, Mr. Cheng said that was "too long to go that way."

72. When asked whether their trip was for business or pleasure, Mr. and Mrs. Cheng both stated, "[b]usiness."

73. When asked from what city they were traveling, Mrs. Cheng said, "Pittsburgh."

74. When asked whether they had checked-in any luggage or bags, Mr. Cheng said that they had not.

75.   When asked whether they packed their own bags, knew all the items in their bags, and if all the contents of their bags and on their persons were theirs, Mr. and Mrs. Cheng both replied "[y]es" to all three questions.

76.   When asked whether anyone had given them anything to put in their bags or on their person to take to Denver, both replied, "[n]o."

   D.  Canine Examination of Mr. and Mrs. Cheng's Luggage at Union Station

77.   At approximately 1:10 p.m., Officer Crowley and his canine partner Gander arrived at the scene of the interview.

78.   When TFO Martinez asked Mr. Cheng if there was any reason why he was avoiding the dog in the Metropolitan Lounge, Mr. Cheng stated, "[n]o, I was just walking around."

79.   TFO Martinez then informed Mr. and Mrs. Cheng that they were going to be asked some additional, basic questions about their bags, to which Mr. Cheng responded, "[o]kay."

80.   TFO Martinez asked Mr. and Mrs. Cheng if canine Gander could check their bags and whether they would place their bags down on the ground for this purpose.

81.   Mr. and Mrs. Cheng agreed and placed their red Hurley® backpack, blue hard-shell roller bag, and black-and-grey backpack on the ground.

82.   TFO Martinez then asked Mr. and Mrs. Cheng to move a few steps away so the dog could sniff their bags.

83.   As requested by TFO Martinez, Officer Crowley then commanded Gander to conduct a search/sniff on Mr. and Mrs. Cheng's bags now located on the floor.

84.   Gander's search/sniff was conducted on July 30, 2018 at the water fountain area below the main entrance of Union Station.

85.   Officer Crowley observed Gander sniff the air, focus his stare, and sit near Mrs. Cheng's

red Hurley® backpack.

86. Officer Crowley recognized this behavior as a positive alert, indicating Gander had smelled one of the five odors he is trained to detect.

87. Officer Crowley did not recognize this behavior from Gander as indicating an interest in any other items, bags, or persons in the area.

E. Consensual Search and Discovery of the Subject Property

88. After Gander gave a positive alert to the bags, TFO Martinez asked Mr. and Mrs. Cheng if they had any weapons or illegal drugs with them, to which they both replied, "[n]o."

89. When asked whether they had any large amounts of U.S. currency or financial instruments on their person or in their bags, Mr. and Mrs. Cheng both said, "[n]o."

90. When TFO Martinez informed Mr. and Mrs. Cheng that Gander had alerted to the presence of a narcotic odor from Mrs. Cheng's red Hurley® backpack, Mr. Cheng once again stated that they do not have any illegal drugs.

91. When TFO Martinez asked again, "[w]hat about large amounts of money," Mr. Cheng changed his answer and said, "I have $40,000 in my bags."

92. When TFO Martinez asked why he lied about not having large sums of money, Mr. Cheng said that he never said he did not.

93. TFO Martinez reminded Mr. Cheng that both he and Mrs. Cheng said that they had no money with them.

94. When asked how they came across such a large sum of money, Mr. Cheng simply said, "[w]e have money. I gamble."

95. TFO Martinez then asked whether they had any deposit slips, bank withdrawal receipts, or any other form of documentation explaining how they obtained the money, and Mr. Cheng

then began speaking to Mrs. Cheng in Chinese.

96. When asked whether they had any receipts from any casino where the winnings might have been reported, Mr. Cheng said, "[n]o."

97. In order to verify his statements, TFO Martinez asked Mr. and Mrs. Cheng if the U.S. currency was in the red backpack – both replied, "[y]es."

98. When TFO Martinez then asked for consent to look in their bags, Mr. Cheng stated that he was going to call his lawyer.

99. TFO Sobkowiak promptly advised Mr. Cheng that he was not under arrest and was free to leave at any time, and that any U.S. currency would be seized for further investigation.

100. Mr. and Mrs. Cheng then gave agents consent to search their bags.

101. After conducting a search of the red Hurley® backpack, TFO Sobkowiak discovered several white envelopes and a plastic bag containing the subject property.

102. TFO Sobkowiak advised Mr. Cheng that there appeared to be more than $40,000 in the bag.

103. When TFO Martinez advised Mr. Cheng to give a correct amount of the money in the bag, Mr. Cheng then stated that there was $220,000 in the bag.

104. Investigators know that had Mr. Cheng won the money at a casino, there would have been an identifier around the cash; that casinos do not disperse cash in any type of bag, box, or bank envelope.

105. When asked again how he obtained the money, Mr. Cheng stated that some of it was his and some came from investors.

106. When asked whether he knew the names of his investors and whether they gave him the money to gamble with, Mr. Cheng replied, "[y]es" to both questions.

107. TFO Martinez advised Mr. and Mrs. Cheng that the subject property was going to be seized for further investigation.

    F.   Questioning of Mr. and Mrs. Cheng at the DEA Office

108. TFO Martinez advised Mr. and Mrs. Cheng that they could accompany agents to the DEA office at Union Station to obtain a receipt for the subject property or, alternatively, that a receipt could be sent by certified mail to the address where they live if they decided to continue with their travel.

109. Mr. and Mrs. Cheng both voluntarily accompanied agents to the office to obtain a receipt for the subject property.

110. While in the office, TFO Martinez asked Mr. and Mrs. Cheng if the subject property belonged to both of them.

111. Although Mrs. Cheng stated that they are a couple and the money belongs to both of them, Mr. Cheng stated that the money was just his.

112. When TFO Martinez advised Mr. and Mrs. Cheng that he was going to put both of their names on the receipt, Mr. Cheng repeated that the money was his.

113. TFO Martinez observed that Mr. Cheng was visibly upset when informed that both their names would be on the receipt.

114. Mr. Cheng stated that he borrowed the subject property from investors.

115. When asked whether he would provide the names of his investors, Mr. Cheng refused.

116. Mr. Cheng then said that he did not want to talk anymore.

117. Although Mr. and Mrs. Cheng signed the address acknowledgment form, they refused to sign the receipt for the subject property.

    G.  Seizure of the Subject Property for Forfeiture

118. Group 24 investigators seized the subject property for forfeiture per DEA guidelines governing asset forfeiture.

119. Mr. and Mrs. Cheng left with no further incident.

II.    Administrative Forfeiture Proceedings

120. On September 10, 2018, DEA initiated administrative forfeiture proceedings against the subject property by mailing a Notice Letter and Notice of Seizure to all potential interest holders via certified mail.

121. In response to this notice, attorneys Vincent Savarese III and Janiece Marshall, of the law office of Gentile, Cristalli, Miller, Armeni, Savarese, on behalf of Mr. and Mrs. Cheng, submitted an online claim to DEA dated October 12, 2018.

122. On October 16, 2018, DEA referred this matter to the United States Attorney's Office for the Northern District of Illinois to initiate judicial forfeiture proceedings.

**First Cause of Action**

123. Plaintiff repeats and realleges the averments in paragraphs one through 122 as though fully set forth herein.

124. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

125. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any **person** in exchange for

14

a controlled substance or listed chemical in violation of [21 U.S.C. §§ 801-904], all proceeds

traceable to such an exchange, and all moneys, negotiable instruments, and securities used or

intended to be used to facilitate any violation of [thereof]" are subject to forfeiture to the United

States. *Id*.

**Second Cause of Action**

126.  Plaintiff repeats and realleges the averments in paragraphs one through 122 as though

fully set forth herein.

127.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to

18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a

transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit,

"dealing in a controlled substance" a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A)

(by way of 18 U.S.C. § 1956(c)(7)(A)).

128.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a

transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such

property," is subject to forfeiture to the United States.

129.  Pursuant to 18 U.S.C. § 1956(a)(3):

> Whoever, with the intent—
>  (A) to promote the carrying on of specified unlawful activity;
>  (B) to conceal or disguise the nature, location, source, ownership, or control of
>      property believed to be the proceeds of specified unlawful activity; or
>  (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property
> represented to be the proceeds of specified unlawful activity, or property used to
> conduct or facilitate specified unlawful activity, shall be fined under this title or
> imprisoned for not more than 20 years, or both…

130.  The term "specified unlawful activity" means "any act or activity constituting

an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

131.  The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

**Third Cause of Action**

132.  Plaintiff repeats and realleges the averments in paragraphs one through 122 as though fully set forth herein.

133.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952, a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

134.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

135.  Pursuant to 18 U.S.C. § 1956(a)(3):

> Whoever, with the intent—
>  (A) to promote the carrying on of specified unlawful activity;
>  (B) to conceal or disguise the nature, location, source, ownership, or control of
>      property believed to be the proceeds of specified unlawful activity; or
>  (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property
> represented to be the proceeds of specified unlawful activity, or property used to
> conduct or facilitate specified unlawful activity, shall be fined under this title or
> imprisoned for not more than 20 years, or both.

136.  The term "specified unlawful activity" means "any act or activity constituting

an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

137.  The list of offenses under § 1961(1)(A) are further defined as "racketeering activity,"

and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

138.  Section 1952(a) describes the following as an indictable act:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility
> in interstate or foreign commerce, with intent to—
>   (1) distribute the proceeds of any unlawful activity; or
>   (2) commit any crime of violence to further any unlawful activity; or
>   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion,
>       management, establishment, or carrying on, of any unlawful activity[.]

139.  Section 1952(b) further describes "unlawful activity" as, "any business enterprise

involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled

Substances Act)[.]". *See* 18 U.S.C. § 1952(b).

### Fourth Cause of Action

140.   Plaintiff repeats and realleges the averments in paragraphs one through 122 as though

fully set forth herein.

141.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to

18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to "dealing

in a controlled substance," a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way

of 18 U.S.C. § 1956(c)(7)(A)).

142.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified

unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States.

*See* 18 U.S.C. § 981(a)(1)(C)(2018).

143.  The term "specified unlawful activity" means "any act or activity constituting

an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

144.  The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

### Fifth Cause of Action

145.   Plaintiff repeats and realleges the averments in paragraphs one through 122 as though fully set forth herein.

146.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 ([i]nterstate and foreign travel or transportation in aid of racketeering enterprises), a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

147.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C)(2018).

148.  The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

149.  The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

150.  Section 1952(a) describes the following as an indictable act:

Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
  (1) distribute the proceeds of any unlawful activity; or
  (2) commit any crime of violence to further any unlawful activity; or
  (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

151. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]" *See* 18 U.S.C. § 1952(b).

## Prayer for Relief

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the subject property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the subject property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the subject property to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

DATED this 10th day of January 2019.

JOHN R. LAUSCH, JR.
United States Attorney
For the Northern District of Illinois

By:   *Jeffrey R. Borup*
      _____

JEFFREY R. BORUP
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Desk: (312) 697-4087
Email: jeffrey.borup@usdoj.gov

Attorneys for Plaintiff
United States of America

State of Illinois        )
                           )   ss.

County of Cook       )
                           )

### VERIFICATION OF DEA TASK FORCE OFFICER ARNOLD MARTINEZ IN SUPPORT OF COMPLAINT FOR FORFEITURE *IN REM*

I, Arnold Martinez, declare under penalty of perjury the following:

1. I am a Task Force Officer for the United States Drug Enforcement Administration ("DEA") since November 2015 where I am assigned to the Chicago Union Station, Group 24.

2. I am also a detective with the Amtrak® Police Department and have been so employed for approximately 4.5 years.

3. My duties and responsibilities as a Task Force Agent with DEA involve investigation of alleged violations of the Controlled Substances Act, Title 21 of the United States Code.

4. I have read the foregoing complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief.

5. This statement is based upon my own personal knowledge as well as information I have received from other agents, persons, and documents; it does not include each and every fact known to me concerning this investigation, but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

Executed this 10th of January 2019, in Chicago, Illinois.

ARNOLD MARTINEZ
Task Force Officer
Drug Enforcement Administration